**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Marvin J. ZYLSTRA,**
**Defendant-Appellant.**

**No. 81–1896.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 5, 1983.

Decided Aug. 9, 1983.

Certiorari Denied Nov. 7, 1983.
See 104 S.Ct. 403.

Bradley E. Prendergast, Chicago, Ill., for defendant-appellant.

Janis H. Kockritz, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before ESCHBACH and COFFEY, Circuit Judges, and NEAHER, Senior District Judge.*

COFFEY, Circuit Judge.

Marvin J. Zylstra appeals from his conviction in the United States District Court for the Southern District of Illinois for offenses arising out of a drug smuggling operation. The defendant claims that: (1) the trial court improperly denied his motion for a change of venue; (2) the increase in the defendant's bond during trial deprived him of effective assistance of counsel and thus violated his Eighth Amendment rights; (3) he received ineffective assistance of counsel; (4) the prosecutor's closing argument was improper and prejudicial; and (5) the trial court improperly punished the defendant for exercising his right to trial by imposing an excessive sentence. We find Zylstra's claims to be without merit and affirm the district court.

## I. FACTS

The defendant, Marvin J. Zylstra, is a pilot and the owner of a Fort Lauderdale, Florida aircraft sales business known as Custom Air, Ltd. In 1977 Zylstra became acquainted with one Richard Dial Thorp who in 1975 had organized a number of people to help in importing large quantities of marijuana from South America for distribution and sale in the United States. Thorp with his associates (collectively known as the "Company"), prior to meeting Zylstra, had smuggled marijuana into the United States via boat. However, after their introduction, Thorp consulted with the defendant Zylstra regarding the use of airplanes in the illicit drug smuggling operation and inquired about the respective load capacities of certain planes, their various fuel ranges, as well as the types of runways required. Later Thorp purchased planes from Custom Air. Manuel Viana, a part-time employee of Zylstra's aircraft business and a pilot, contacted his wife's relatives living in Columbia and arranged for supplies of marijuana to be picked up by "Company" aircraft in the jungles of Columbia. From 1976 through 1979, the "Company" smuggled over 200,000 pounds of marijuana (approximately 35 plane loads) into small airports in Missouri, Georgia, South Carolina and Alabama for distribution in Missouri and Illinois. It should be pointed out, however, that not all of the "Company's" clandestine missions were successful as numerous planes (including at least 3 registered to Zylstra's Custom Air, Ltd.) and their cargo were seized by United States and Columbian government officials.

Because the governments' repeated seizures of "Company" planes uncovered the widespread nature of the "Company's" drug smuggling enterprise, the Drug Enforcement Administration (DEA) in 1979 set up a task force to infiltrate the "Company." DEA Agent Hubert R. "Rick" Coleman, posing as an aircraft buyer interested in smuggling marijuana, made contact with the defendant Zylstra and after gaining his confidence, developed a closer relationship that allowed him to learn the intricacies of the expansive "Company" operations as well as Zylstra's role as procurer and caretaker of the syndicate's aircraft. During the month of May in 1979, the defendant, Agent Coleman and DEA supervisor Richard Waber (posing as Coleman's "boss" in the bogus smuggling operation) were introduced to the "Company's" main source of Columbian marijuana, the Vianas. A short time thereafter, the "Company" members seemed to become suspicious of Agents Coleman and Waber, and Coleman noticed a marked change in Zylstra's attitude toward him and believed that the defendant was, in all probability, aware of his true identity.

In November of 1980, the Department of Justice decided to terminate their investigation of the "Company" and initiated proceedings before a Grand Jury in the Southern District of Illinois. After hearing approximately 200 witnesses and reviewing

---

* The Honorable Edward R. Neaher, Senior District Judge of the Eastern District of New York, is sitting by designation.

thousands of documents the Grand Jury issued an indictment against the defendant and ten other individuals (including Thorp and the Vianas). Pursuant to the Grand Jury indictment, the defendant was arrested in Florida on November 21, 1980 and bail was set at $1,000,000.00. After the completion of Florida removal proceedings, Zylstra's case was transferred to the Southern District of Illinois. The indictment charged the defendant with one count of participation in a racketeer influenced and corrupt organization in violation of 18 U.S.C. §§ 1961, 1962(d) and 1963; one count of participation in a continuing criminal enterprise in violation of 21 U.S.C. § 848; twelve counts of possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1); and 26 counts of interstate travel in aid of racketeering in violation of 18 U.S.C. § 1952(a).

The defendant Zylstra, without benefit of counsel, filed a motion in early January of 1981 for a change of venue from the Southern District of Illinois to the Southern District of Florida contending that Florida was the proper site for trial as 27 of the prospective witnesses, several defendants and their attorneys all resided in Florida. At the motion hearing, the defendant, now with retained counsel, argued that the case should be transferred back to Florida as most of the events allegedly linking Zylstra to the conspiracy took place in Florida. The court denied the motion noting that since all of the defendants charged in the indictment had failed to join in the request for the change of venue, a granting of the motion could very conceivably result in numerous severances necessitating multiple trials in different locales. The court also noted that the Southern District of Illinois was just as accessible to a substantial number of Zylstra's proposed witnesses and that the government would bear the cost of bringing his witnesses to the trial.

On the date of trial, April 13, 1981, Zylstra remained as the lone defendant, as the other codefendants charged and apprehended had entered pleas of guilty and agreed to testify against him at trial. After trial, the jury found the defendant Zylstra guilty of 39 of the 40 counts charged. His post-trial motions were denied and he was sentenced to 210 years of incarceration.

## II. ISSUES PRESENTED

A. Did the district court err in denying Zylstra's motion for a change of venue?

B. Did the trial court improperly reinstate the defendant's initial cash bond during trial?

C. Did the defendant receive ineffective assistance of counsel?

D. Was the prosecution's closing argument improper and prejudicial?

E. Did the district court abuse its discretion when sentencing Zylstra?

## A. VENUE

█ The defendant contends that the district judge improperly denied his motions for a change of venue, claiming that he was seriously inconvenienced by being separated from his Florida witnesses and was thus unable to adequately prepare his defense.[1] Zylstra argued to the trial court that his family and business were in Florida and potential witnesses as well as other defendants and their attorneys resided in Florida, or were more accessible in Florida, and that he lacked resources sufficient to bring his witnesses to Illinois for trial. The government responded that venue was proper in the Southern District of Illinois because there were 11 defendants charged in the indictment and only Zylstra and Ligia Viana out of the 11 defendants requested a change of venue which would have resulted in great inconvenience and expense for nu-

1. The defendant brought three motions under Fed.R.Crim.P. 21(b) seeking to have his trial moved to the Southern District of Florida. Fed.R.Crim.P. 21(b) recites:

"(b) Transfer of Other Cases. For the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding as to him or any one or more of the counts thereof to another district."

merous witnesses, as well as separate trials, had the motions been granted. The government also argued that Richard Thorp (who directed the operations of the "Company") resided in the Southern District of Illinois and further that the imported marijuana was transported into the Southern District of Illinois prior to distribution in the Chicago area and further that 38 of the 40 offenses charged in the indictment occurred in the Southern District of Illinois. Additionally, the vast majority of the witnesses the government intended to call and the documentary evidence upon which it relied were located in the district of proper venue, the Southern District of Illinois.

We recognize that the question of transfer of venue under Rule 21(b), " '(f)or the convenience of parties and witnesses and in the interest of justice,' is one involving [a] realistic approach, fair consideration and judgment of sound discretion on the part of the district court." *United States v. Phillips,* 433 F.2d 1364, 1368 (8th Cir.1970), *cert. denied,* 401 U.S. 917, 91 S.Ct. 900, 27 L.Ed.2d 819 (1971). "Change of venue in a criminal case is discretionary, and a trial judge's decision on the matter is entitled to deference." *United States v. Hunter,* 672 F.2d 815, 816 (10th Cir.1982). It is clear that the trial court properly exercised its discretion and considered all of the facts and circumstances, including the alleged inconveniences to the defendant and the government, in denying the defendant's change of venue motion. *See United States v. Calabrese,* 645 F.2d 1379, 1384 (10th Cir.), *cert. denied,* 451 U.S. 1018, 101 S.Ct. 3008, 69 L.Ed.2d 390, 454 U.S. 831, 102 S.Ct. 127, 70 L.Ed.2d 108 (1981).

If the court had granted the defendant's initial motion for change of venue it would in all probability have resulted in the severance of several trials into multiple trials in various districts throughout the country involving the other codefendants. Such a multiplication of litigation would have resulted in great inconvenience to all the witnesses (repeated appearances in various and sundry judicial districts) as well as greater expense. Courts must be mindful of these difficulties as well as the actual expense and waste of court time in our severely burdened and overtaxed federal judicial system. "Criminal defendants have no constitutional right to have a trial in their home districts, nor does the location of the defendant's home have 'independent significance in determining whether transfer to that district would be in the interest of justice.'" *United States v. McManus,* 535 F.2d 460, 463 (8th Cir.1976), *cert. denied,* 429 U.S. 1052, 97 S.Ct. 766, 50 L.Ed.2d 769 (1977) (*quoting Platt v. Minnesota Mining and Manufacturing Co.,* 376 U.S. 240, 245–46, 84 S.Ct. 769, 772–71, 11 L.Ed.2d 674 (1964)).

We are well aware that on the date of the commencement of the trial, Zylstra was the only remaining defendant and thus the government's argument against severance because of multiple trials was moot on that date. However, at the time the first venue motion was heard the trial judge had before him various defendants from multiple federal jurisdictions and had no way to foretell whether the other codefendants would change their pleas of not guilty to pleas of guilty before the date of trial. The last codefendant, in fact, pled guilty 24 hours before the defendant's trial was scheduled to commence. The defendant renewed his motion for a change of venue on the day of his trial. The motion was again denied because the jury had already been chosen, the witnesses were present, the evidence had been marshalled and the court was ready to proceed to trial.

As we stated above, the majority of the government's witnesses and evidentiary documents were in the Southern District of Illinois. *See United States v. Schoor,* 597 F.2d 1303, 1308 (9th Cir.1979). The trial court observed that many of the defendant's witnesses were not residents of Florida and were just as accessible to Illinois as they were to Florida and any cost of transporting witnesses, contrary to what the defendant alleged, would be borne by the government and not the defendant if in fact he was without funds to bring his witnesses to Illinois for trial. *See United States v. Hunter,* 672 F.2d at 817. We hold

that the trial judge did not abuse his discretion in denying a change of venue after considering the following factors: (1) The majority of the government's 200 witnesses and thousands of documents were located in the Southern District of Illinois; (2) The "Company" transported the marijuana into the Southern District of Illinois for further distribution and 38 of the 40 counts charged in the indictment were related to activities in Southern Illinois; (3) Richard Thorp directed the activities of the "Company" from the Southern District of Illinois; (4) A substantial number of the defendant's proposed witnesses were no more accessible to the Southern District of Florida than the Southern District of Illinois; (5) A grant of the defendant's motion for change in venue had a significant chance of resulting in multiple trials at greater expense and inconvenience to the vast majority of the parties concerned; and (6) Because the government would bear the expense of transporting the defendant's witnesses to the trial (either in Illinois or Florida) if he was without funds, his defense would not be hampered.

## B. EXCESSIVE BAIL

The defendant contends that the trial court abused its discretion and violated his Eighth Amendment rights in reinstating, on the third day of his trial, its earlier $1,000,-000 cash bond. Zylstra also baldly asserts that his incarceration during trial due to his failure to make bail denied him effective assistance of counsel.

■ The Eighth Amendment to the United States Constitution proscribes excessive bail. "The primary purpose of bail is to allow an accused person not yet tried to be free of restraint while at the same time insuring that person's presence at the pending court proceedings." *United States v. Smith*, 444 F.2d 61, 62 (8th Cir.1971), *cert. denied sub nom., Haley v. United States*, 405 U.S. 977, 92 S.Ct. 1205, 31 L.Ed.2d 253 (1972). Excessive bail is an amount greater than that which is reasonably necessary to ensure that the defendant will be present at trial. "As long as the primary reason in

setting bond is to produce the defendant's presence, the final amount, type, and other conditions of release are within the sound discretion of the releasing authority, and we may review only for an abuse of that discretion." *United States v. James*, 674 F.2d 886, 891 (11th Cir.1982).

■ Federal Rule of Criminal Procedure 46(b) permits the trial court under certain conditions to reset bail in the middle of a trial to insure the defendant's continuing presence at trial. Factors frequently change during the course of proceedings which influence the defendant and thus necessitate an increase or reinstatement of bail. *See Bitter v. United States*, 389 U.S. 15, 16, 88 S.Ct. 6, 7, 19 L.Ed.2d 15 (1967); 18 U.S.C. § 3146(b); *United States v. Bentvena*, 288 F.2d 442 (2d Cir.1961); *United States v. Allison*, 414 F.2d 407 (9th Cir.), *cert. denied*, 396 U.S. 968, 90 S.Ct. 449, 24 L.Ed.2d 433 (1969); and *United States v. Meinster*, 481 F.Supp. 1117 (S.D.Fla.1979), *aff'd sub nom., United States v. Phillips*, 664 F.2d 971 (5th Cir.1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). Among the factors considered by the trial court in this case were: (1) the defendant was a self-proclaimed alcoholic; (2) the prosecution had presented an overwhelming amount of evidence as to the defendant's guilt; and (3) Richard Thorp, a codefendant and head of the "Company", was still at large after escaping and forfeiting his bond during a pending state trial in Georgia. "While these actions by [a] codefendant[ ] do not prove that other defendants necessarily intend to flee, they do make vividly clear the substantial risk that defendants charged with [the same crime may] find it expedient to flee." *United States v. Meinster*, 481 F.Supp. at 1123. The evidence presented at Zylstra's trial clearly showed him to also be a member of the hierarchy of the "Company", a multi-million dollar drug smuggling syndicate.

It is a matter of common knowledge that the prosecution of big-time illegal drug trafficking is frequently hampered by threats to witnesses, prosecutors and even judges, which all too often are carried out.

Traffic in illicit drugs is a matter of pressing national concern and the trial court was properly interested in seeing that at least one member of the "Company's" hierarchy would be present in court during his entire trial. It was thus not unreasonable for the trial court to reinstate the original bond as it was evident that Zylstra would have more of a temptation to flee after having heard the wealth of evidence against him. After a review of the record, we hold that the trial court did not abuse its discretion in setting or reinstating Zylstra's $1,000,000 bond.

## C. EFFECTIVE ASSISTANCE OF COUNSEL

The defendant maintains that he received ineffective assistance of counsel alleging that his attorney failed to interview the majority of potential witnesses he named and that the attorney conducted only a cursory investigation of the case since he stipulated to 38 of 40 counts charged. It is interesting to note that on the seventh day of the eight-day trial, the defendant's counsel notified the court that "irreconcilable differences" were developing between himself and the defendant because of his trial strategy in deciding to call or not call certain witnesses and the examination of witnesses. In effect the defendant, untrained and unskilled in trial technique and being aware of the overwhelming evidence and case being built against him, decided to attempt to take over the trial of his case, interfering with his counsel's trial strategy. After discussing the matter with the judge, the defendant agreed to have his counsel continue his defense. Prior to his sentencing, the defendant filed a motion for a new trial alleging that his attorney did not prepare a proper defense because he refused to call all the witnesses identified by the defendant. The court denied the motion stating that "the presentation of certain evidence and the exclusion of certain evidence ... was a matter in the judgment of counsel. And I certainly find nothing that would indicate that counsel in any way did not properly handle the case."

■ This court has defined effective assistance of counsel as that "which meets a minimum standard of professional representation." *United States ex rel. Williams v. Twomey,* 510 F.2d 634, 641 (7th Cir.), *cert. denied,* 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975). This standard applies whether counsel is privately retained or publicly appointed. *Id.* at 640. A reviewing court begins with the presumption of adequate representation and considers the effectiveness of counsel in view of the totality of circumstances. *See United States v. Fleming,* 594 F.2d 598, 606–07 (7th Cir.), *cert. denied,* 442 U.S. 931, 99 S.Ct. 2863, 61 L.Ed.2d 299 (1979); and *United States v. Phillips,* 640 F.2d 87, 92 (7th Cir.), *cert. denied,* 451 U.S. 991, 101 S.Ct. 2331, 68 L.Ed.2d 851 (1981).

■ It is important to note that Zylstra does not complain that he was denied the opportunity to make fundamental decisions regarding his case (e.g., waiving a jury trial, testifying on his own behalf), *see Jones v. Barnes,* —— U.S. ——, ——, 103 S.Ct. 3308, 3311, 77 L.Ed.2d 987 (1983), but rather he questions his counsel's preparation of his defense and trial strategy. During trial the defendant complained to the court that his attorney had refused to interview most of the potential witnesses he provided. The attorney answered the accusation and pointed out to the trial court that the defendant was unable to supply the last names or addresses of many of the proposed witnesses and that based on the information given him by the defendant about their testimony they would not aid the defense. Although counsel should make reasonable investigations into all defenses, *see United States v. Hearst,* 466 F.Supp. 1068 (N.D.Cal.1978), *aff'd in part vacated in part,* 638 F.2d 1190 (9th Cir.1980), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981), an attorney is not expected to be infallible. "For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the very goal of vigorous and effective advoca-

cy. . . ." *Jones v. Barnes,* —— U.S. at ——, 103 S.Ct. at 3314. Zylstra's attorney informed the trial court that the defendant repeatedly disagreed with counsel's judgments regarding the presentation of his defense. To allow the defendant to repeatedly interfere with the trial strategy of his counsel would disrupt the proper functioning of the trial court during trial and create havoc.

As we most recently reiterated in *United States v. Weston,* 708 F.2d 302, 306 (7th Cir.1983), "a 'minimum standard of professional representation' guarantees the defendant reasonably effective counsel, not errorless counsel. Given the pressures of trial and a myriad of quick decisions that must be made by counsel, and that even the most gifted attorney is fallible, occasional erroneous representation is not unlikely." Hindsight frequently provides a wiser course, but "[i]n reviewing an attorney's performance we are not free to second-guess his legitimate tactical decisions." *Weston,* at 306.

Defendant, on appeal, also maintains that his representation was grossly inadequate by virtue of counsel stipulating to 38 of 40 charges which substantially reduced the government's burden of proving the indictment. Counsel's strategy was to prove that the defendant was "an unwitting dupe of the conspirators." Counsel did not stipulate to key elements of the defendant's involvement in the conspiracy, rather he stipulated to the allegations of the activities of other members of the conspiracy. The government still had to present evidence beyond a reasonable doubt to the court and the jury that the defendant was actually a member of the conspiracy and to find him guilty of every element of each count recited in the indictment (40 counts). It is evident that if the stipulations had not been made between the prosecution and defense counsel (a matter of trial strategy), the government would, no doubt, have produced the over 200 Grand Jury witnesses and trial time would have substantially increased. In fact, the record demonstrates that many facts stipulated to were testified to at trial by several of the codefendants.

In denying defendant's motion for a new trial, the court did not find the attorney's conduct or trial strategy improper. Stipulations are of necessity often part of trial strategy. Frequently, the defense is well-advised not to have a multitude of witnesses testifying about each and every minute piece of evidence, thus emphasizing and amplifying to the jury the overwhelming evidence against the accused. Although the defense strategy did prove to be unsuccessful, from our perusal of the record we find nothing contained therein indicating that the defendant's counsel failed to satisfy the required standard of professional competency in his representation of the defendant. "A defendant is entitled to a fair trial but not a perfect one." *Lutwak v. United States,* 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1958).

## D. CLOSING ARGUMENT

The defendant claims that the prosecutor's argument during rebuttal was prejudicial, in that the prosecutor implied that marijuana was being distributed to jurors' families and friends and that references were made to charges of an alleged murder which had been stricken from the indictment.

The standard used in this circuit to determine whether a prosecutor's comments were so egregious as to require reversal was stated in *United States ex rel. Clark v. Fike,* 538 F.2d 750, 760 (7th Cir.1976), *cert. denied,* 429 U.S. 1064, 97 S.Ct. 791, 50 L.Ed.2d 781 (1977) (quoting *United States ex rel. Kirk v. Petrelli,* 331 F.Supp. 792, 795–96 (N.D.Ill.1971)).

"The question to be decided is whether the . . . statements were so inflammatory and prejudicial to the defendant petitioner as to deprive him of a fair trial and thus deprive him of his liberty without due process of law as proscribed by the Fourteenth Amendment. The standard for the court to apply in making a determination of whether the petitioner was afforded a fair trial is [by] jurispruden-

tial necessity a broad one. . . . [E]ach case must be decided on its unique facts." "It is thus necessary to examine the allegedly prejudicial remarks of the prosecutor in the context of the trial as a whole." *United States ex rel. Garcia v. Lane,* 698 F.2d 900, 902 (7th Cir.1983).

■ During his closing argument the prosecutor made a reference to the "Company's" bringing in "200,000 pounds of marijuana into our country for distribution to our children and friends." Based upon our reading of the allegedly improper statement, it appears that the prosecutor was making a reference to the "Company's" threat to *our society* as a whole ("families" and "friends" used as generalities) rather than to any individual's particular family and friends. A prosecutor can impress upon the jury the seriousness of the charges and a comment on the gravity of the drug problem in this country is certainly not inappropriate. *See Malley v. Manson,* 547 F.2d 25, 28 (2d Cir.1976), *cert. denied,* 430 U.S. 918, 97 S.Ct. 1335, 51 L.Ed.2d 598 (1977).

Appellant also objects to the prosecutor's comments about DEA agents who "risked their lives, went undercover, [and] gained the confidences of the defendant by pretending to be follow dopers. . . ." The defendant argues that those comments were direct references to an issue the trial judge had previously instructed the prosecutor not to raise, relating to the alleged murder of a DEA informant which had been stricken from the indictment for inadequate proof. The prosecutor did not accuse the defendant of murder nor did he mention the murder charge which had been stricken from the indictment. It is a matter of common knowledge that drug trafficking is a violent enterprise and that government agents operating undercover face the constant risk of death or serious injury. Reviewing the record, the statement was proper considering that one of his stipulations conceded that the "Company" had put out "contracts to do away with" certain people.

■ Our review of the record shows that the evidence overwhelmingly demonstrated the defendant's involvement in the conspiracy. "An arguably improper remark will require determination of its probable effect on the jury in combination with all the evidence presented. If the evidence of guilt is sufficient to find beyond a reasonable doubt that the error was harmless, reversal may not be required." *United States v. Rodriguez,* 627 F.2d 110, 113 (7th Cir. 1980). *See also United States v. Buege,* 578 F.2d 187, 189 (7th Cir.), *cert. denied,* 439 U.S. 871, 99 S.Ct. 203, 58 L.Ed.2d 183 (1978). We find that the defendant has made no showing of actual prejudice.

## E. SENTENCE

■ The defendant received a total of 210 years on 39 counts and now argues that he was unjustly penalized for exercising his right to trial. He points to the sentences imposed on three other codefendants who pled guilty; two received sentences of no more than 5 years and the other was sentenced to 20 years. The defendant complains that one codefendant who received a sentence of 5 years was the self-proclaimed "number 2 man" in the organization, while the defendant was considered by the trial court to be somewhere in the "executive hierarchy."

A DEA intelligence analyst testified at the defendant's sentencing hearing that the defendant had links with other drug distribution organizations and that the defendant was second in command in the "Company". The district court concluded that the defendant was a member of the "Company's" "executive suite" and thus deserving of harsher treatment.

Generally, " 'once it is determined that a sentence is within limitations set forth in the statute under which it is imposed, appellate review is at an end . . .' unless the sentencing judge relied on improper or unreliable information in exercising his or her discretion or failed to exercise any discretion at all in imposing the sentence." *United States v. Main,* 598 F.2d 1086, 1094 (7th Cir.), *cert. denied,* 444 U.S. 943, 100 S.Ct. 301, 62 L.Ed.2d 311 (1979) (*quoting Dorsz-*

*ynski v. United States,* 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974)). *See also United States v. Horton,* 676 F.2d 1165, 1173 (7th Cir.1982), *cert. denied,* —— U.S. ——, 103 U.S. 1184, 75 L.Ed.2d 431 (1983); *United States v. Buege,* 578 F.2d 187, 190 (7th Cir.1978); and *United States v. Clements,* 634 F.2d 183, 186–88 (5th Cir.1981).

The district court sentenced the defendant to a term well within the range provided for by statute. The court recognized its responsibility to "impose a sentence that [was] reasonable." The defendant came before the trial court for sentencing as an individual convicted of being actively and intimately involved in a massive illegal drug smuggling conspiracy. Others who were more peripherally involved with the "Company" received lesser sentences on fewer counts.[2] We hold that the trial judge did not abuse his discretion in determining the defendant's sentence.

## II. CONCLUSION

The trial judge did not abuse his discretion in refusing to grant defendant's motion for a change of venue, in reinstating bail or in the sentencing of the defendant. Nor do we find any merit in petitioner's arguments that he received ineffective assistance of counsel or that he was prejudiced by the prosecutor's closing remarks. The judgment of the district court is AFFIRMED.

---

**2.** We note that under 21 U.S.C. § 848(c) defendants found guilty of violating the continuing criminal enterprise statutes are not eligible for parole in conformance with the general parole eligibility standards, 18 U.S.C. § 4201 *et seq.* Codefendants who were sentenced to lesser total sentences than Zylstra will, under 21 U.S.C. § 848(c), be required to serve greater periods of time before being eligible to be considered for parole. Viewing Zylstra's sentence in this perspective lends additional support to our holding that the trial court did not abuse its discretion in sentencing the defendant.

Because Zylstra is eligible for parole after serving ten years of his sentence this case is easily distinguishable from *Solem v. Helm,* —— U.S. ——, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). *See Rummel v. Estelle,* 445 U.S. 263, 280–281, 100 S.Ct. 1133, 1142–1143, 63 L.Ed.2d 382 (1980).